1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD WARD, | CASE NO. 1:06-cv-00311-AWI-SMS (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATION TO DISMISS COMPLAINT FOR FAILURE/INABILITY TO STATE A CLAIM |
| v. | |
| VOSS, et al., | [Doc. 1] |
| Defendants. | |
| _____/ | |

I.    **FINDINGS**

A.    **Procedural History**

Ronald Ward ("plaintiff"), is a civil detainee proceeding pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff filed this action on March 21, 2006.

B.     **Screening Requirement**

The court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1),(2). "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action or appeal ... fails to state a claim upon which relief may be granted."  28 U.S.C. § 1915(e)(2)(B)(ii).

1    A complaint, or portion thereof, should only be dismissed for failure to state a claim upon

2  which relief may be granted if it appears beyond doubt that plaintiff can prove no set of facts in

3  support of the claim or claims that would entitle him to relief.  See Hishon v. King & Spalding,

4  467 U.S. 69, 73 (1984), citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Palmer v.

5  Roosevelt Lake Log Owners Ass'n, 651 F.2d 1289, 1294 (9th Cir. 1981).  In reviewing a

6  complaint under this standard, the court must accept as true the allegations of the complaint in

7  question, Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976), construe the

8  pleading in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor.

9  Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).

10       **C.    Plaintiff's Complaint**

11       Plaintiff is a civil detainee at Coalinga State Hospital (CSH) where he is being held

12  pursuant to Welfare and Institutions Code §§ 6600, et seq. (the Sexually Violent Predator's Act -

13  SVP).  Plaintiff names as defendants: Tom Voss, Executive Director; Barbara Devine, Unit 1

14  Supervisor; Brian Bowely, Unit 2 Supervisor; Kim Wyatt, Unit 3 Supervisor; September

15  Winchell, Unit 4 Supervisor; Ryan Argulio, Unit 6 Supervisor; Rocky Spurgeon, Director; Jim

16  Robinson, Program 1 Nursing Coordinator; Patrick Daley, Chief of Central Program Services;

17  James Walter, Unit 1 Shift Lead; Gary Renzaglia, Clinical Administrator; and J. Does, CSH

18  employees.  Plaintiff seeks monetary damages and injunctive relief.

19       Plaintiff seeks redress for an alleged violation of his First Amendment constitutional

20  rights to free speech and peaceful assembly.  Plaintiff alleges that on February 21, 2006, the

21  telephone service for patient inmates at CSH was undesirably and inexplicably altered and that

22  all inmate typewriters were replaced with typewriters without memory or any advanced

23  formatting features.  As a result, on February 24, 2006 and March 3, 2006 the majority of patient

24  inmates peacefully assembled in the Main Courtyard (MCY).  On March 6, 2006, March 7, 2006,

25  and March 9, 2006 a lesser number of patient inmates stood in a row at the MCY holding picket

26  signs.  Thereafter, patient inmates were no longer allowed to possess felt tip markers and

27  highlighters.  On March 10, 2006 after administrative rule changes, a number of patient inmates

28  signed out and held picket signs while waiting to enter the canteen.  Subsequently, the picket

2

1   signs were deemed contraband and were confiscated by CSH officials.  Doc. 1, pp. 4-11.

2       Plaintiff's complaint raises claims which are not, and cannot be remedied to become,

3   cognizable.  Thus, the Court is required to dismiss plaintiff's complaint with prejudice.

4       **D.    Plaintiff's Claims**

5           **1.    *Standards Applicable to Civil Detainees***

6       "[C]ivil detainees retain greater liberty protections than individuals detained under

7   criminal process, and pre-adjudication detainees retain greater liberty protections than convicted

8   ones . . . ."  Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004) (citations omitted).  Treatment is

9   presumptively punitive when a civil detainee is confined in conditions identical to, similar to, or

10  more restrictive than his criminal counterparts, and when a pre-adjudication civil detainee is

11  detained under conditions more restrictive than a post-adjudication civil detainee would face.  Id.

12  at 932-33.

13      "The law generally requires a careful balancing of the rights of individuals who are

14  detained for treatment, not punishment, against the state's interests in institutional security and

15  the safety of those housed at the facility.  See, e.g. Youngberg v. Romeo, 457 U.S. 307, 319-22

16  (1982).  In weighing those interests, it cannot be ignored that, unlike the plaintiff in Youngberg

17  who was civilly committed because of mental infirmities, SVPs have been civilly committed

18  subsequent to criminal convictions and have been adjudged to pose a danger to the health and

19  safety of others.  Therefore, the rights of SVPs may not necessarily be coexistensive with those

20  of all other civilly detained persons."  Hydrick v. Hunter, 500 F.3d 978, 990 (9th Cir. 2007).

21      However, the conditions of confinement for SVP's cannot be more harsh than those under

22  which prisoners are detained, except where a statute creates a relevant difference.  Id. At 989.

23      "In the civil commitment setting, a patient's liberty interests are balanced against the

24  relevant state interests to determine whether the state has violated the patient's constitutional

25  rights. . . .  Challenges to prison restrictions that are asserted to inhibit First Amendment

26  interests must be analyzed in terms of the legitimate policies and goals of the corrections system.

27  Similarly, First Amendment challenges of [] policies must be analyzed in terms of the legitimate

28  polices and goals of [] treatment. . . ."  Spicier v. Richards 2007 WL 4561101 (W.D.Wash. Dec

1  21, 2007) (NO. C07-5109FDB) citing <u>Youngberg</u>, 457 U.S. at 318; <u>Pell v. Procunier</u>, 417 U.S.

2  817 (1974); and <u>Hydrick</u>, 500 F.3d at 990.

3                    **2.** *__Freedom of Speech/Association__*

4           Plaintiff's allegations revolve around his concept that his rights to free speech and

5  freedom of assembly have been violated by the staff at CSH disbanding the gatherings and

6  thereafter curtailing continued activities via confiscation of felt tip pens/highlighters and

7  designating picketing materials as contraband.  Doc. 1, pp. 4-10.  However, as an SVP, plaintiff

8  does not have the same rights to free speech and freedom of assembly as the general public.

9           The Supreme Court has long recognized that "(l)awful incarceration brings about the

10 necessary withdrawal or limitation of many privileges and rights, a retraction justified by the

11 considerations underlying our penal system."  <u>Price v. Johnston</u>, 334 U.S. 266, 285 (1948); see

12 also <u>Pell</u>, 417 U.S. at 822; and <u>Wolff v. McDonnell</u>, 418 U.S. 539, 555 (1974).

13          "The fact of confinement and the needs of the penal institution impose limitations on

14 constitutional rights, including those derived from the First Amendment, which are implicit in

15 incarceration. [The Supreme Court] noted in <u>Pell</u>, supra at 822:

16          (A) prison inmate retains those First Amendment rights that are not
            inconsistent with his status as a prisoner or with the legitimate penological
17          objectives of the corrections system.  Thus, challenges to prison restrictions
            that are asserted to inhibit First Amendment interests must be analyzed in
18          terms of the legitimate policies and goals of the corrections system, to
            whose custody and care the prisoner has been committed in accordance with
19          due process of law.

20          "Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by

21 confinement are those associational rights that the First Amendment protects outside of prison

22 walls.  The concept of incarceration itself entails a restriction on the freedom of inmates to

23 associate with those outside of the penal institution.  Equally as obvious, the inmate's 'status as a

24 prisoner' and the operational realities of a prison dictate restrictions on the associational rights

25 among inmates.

26          "Because the realities of running a penal institution are complex and difficult, [it has] also

27 [been] recognized the wide-ranging deference to be accorded the decisions of prison

28 administrators. [As] noted in <u>Procunier v. Martinez</u>, 416 U.S. 396, 405 (1974):

                                        4

1
2
3

(C)ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.' (Footnote omitted.)

4   Jones v. North Carolina Prisoners' Labor Union, Inc. 433 U.S. 119, 125-26 (1977)

5      " 'The invocation of the First Amendment, whether the asserted rights are speech or

6   associational, does not change the analysis.  In a prison context, an inmate does not retain those

7   First Amendment rights that are "inconsistent with his status as a prisoner or with the legitimate

8   penological objectives of the corrections system." '  Pell, supra at 822.  Prisons, it is obvious,

9   differ in numerous respects from free society.  They, to begin with, are populated, involuntarily,

10  by people who have been found to have violated one or more of the criminal laws established by

11  society for its orderly governance.  In seeking a 'mutual accommodation between institutional

12  needs and objectives (of prisons) and the provisions of the Constitution that are of general

13  application,' Wolff, 418 U.S. at 556, the [Supreme] Court has repeatedly recognized the need for

14  major restrictions on a prisoner's rights.  See, e. g., id., 418 U.S., at 561-562; Lanza v. New York,

15  370 U.S. 139, 143 (1962).  These restrictions have applied as well where First Amendment

16  values were implicated."  Jones, 433 U.S. at 129-30 citing Pell, supra; Procunier, supra; and

17  Meachum v. Fano, 427 U.S. 215 (1976).

18      _____**a.**      ***Preserving Order and Authority in Prisons***
        _____***prevails over SVP's 1ˢᵗ Amd. Rights***:

19

20      "First Amendment associational rights, while perhaps more directly implicated by the

21  regulatory prohibitions, likewise must give way to the reasonable considerations of penal

22  management.  As already noted, numerous associational rights are necessarily curtailed by the

23  realities of confinement.  They may be curtailed whenever the institution's officials, in the

24  exercise of their informed discretion, reasonably conclude that such associations, whether

25  through group meetings or otherwise, possess the likelihood of disruption to prison order or

26  stability, or otherwise interfere with the legitimate penological objectives of the prison

27  environment.  As [the Supreme Court] noted in Pell, supra at 823, 'central to all other corrections

28  goals is the institutional consideration of internal security within the correctional facilities

1  themselves.'" Jones, supra at 132.

2      The interest in preserving order and authority in the prisons is self-evident.  Prison life,

3  and relations between the inmates themselves and between the inmates and prison officials or

4  staff, contain the ever-present potential for violent confrontation and conflagration.  Responsible

5  prison officials must be permitted to take reasonable steps to forestall such a threat, and they

6  must be permitted to act before the time when they can compile a dossier on the eve of a riot.

7  The case of a prisoners' union, where the focus is on the presentation of grievances to, and

8  encouragement of adversary relations with, institution officials surely would rank high on

9  anyone's list of potential trouble spots.  If the appellants' views as to the possible detrimental

10  effects of the organizational activities of the union  are reasonable, as we conclude they are, then

11  the regulations are drafted no more broadly than they need be to meet the perceived threat which

12  stems directly from group meetings and group organizational activities of the union.  When

13  weighed against the First Amendment rights asserted, these institutional reasons are sufficiently

14  weighty to prevail.  The informed discretion of prison officials that there is potential danger may

15  be sufficient for limiting rights even though this showing might be 'unimpressive if . . .

16  submitted as justification for governmental restriction of personal communication among

17  members of the general public.'" Jones, supra at 132-33 & fn. 9 citing Wolff, 418 U.S. at

18  561-562; Procunier, supra at 412-416; and Pell, supra at 825.

19      Plaintiff argues that since his fundamental rights have been violated, he is not required to

20  exhaust administrative remedies before bringing this action.  However, as an SVP, plaintiff's

21  rights to unfettered free speech and/or freedom of assembly may be curtailed by the legitimate

22  penological interest of preserving order.

23          **b.**      ***Prison Facility is not a Public Forum:***

24      Plaintiff attempts to parallel the site of the inmate gatherings and picketing activities to a

25  public forum.  He specifically alleges that "the Mall" (which contains the MCY, gym, post office,

26  fast food restaurant, canteen, store, barber shop, library, etc.) ". . . is similar in design and

27  function to an indoor shopping mall." Doc. 1, pg. 10-11.

28      The Supreme Court upheld a ban on political meetings at Fort Dix, and that a

1    Government enclave such as a military base was not a public forum.  <u>Greer v. Spock</u>, 424 U.S.

2    828 (1976).  A prison may be no more easily converted into a public forum than a military base.

3    <u>Jones</u>, supra at 134.

4          Thus, "the Mall" where the gatherings and picketing took place is not viewed as a public

5    forum so as to protect plaintiff's speech and assembly activities.

6    _____   **c.**    ***Exhaustion of Administrative Remedies***

7          Plaintiff does not state whether he has exhausted his administrative remedies, although

8    the Court infers that he did not as plaintiff argues that the requirement does not apply to this case.

9    Doc. 1, pg. 15.

10         Plaintiff accurately states "[n]either the PLRA's requirement that prisoner-plaintiffs

11   seeking to proceed in forma pauperis must provide copies of prisoner trust fund account

12   statements, nor the PLRA's requirement that prisoners seeking to file civil actions regarding

13   prison conditions must exhaust available administrative remedies, applies to [civil detainees

14   under California's Sexually Violent Predators Act]."  <u>Page v. Torrey</u> 201 F.3d 1136 (9th Cir.

15   2000).  The Court has already grated plaintiff IFP status, but regardless of plaintiff's exhaustion

16   of administrative remedies, must dismiss this action based on failure and inability to state

17   cognizable claims for infringement on his rights to free speech and assembly.

18         Further, where there exists an inmate grievance procedure through which correctional

19   officials can be informed about inmate complaints concerning prison conditions, and through

20   which remedial action may be secured, regulatory restrictions on prisoners' First Amendment

21   rights of expression are not per se unconstitutional. <u>Jones</u>, supra at 131 fn. 6 citing <u>Procunier</u>

22   supra at 413; and <u>Greer</u>, supra at 847.

23         Plaintiff acknowledges that there is an inmate grievance procedure in existence at CSH.

24   Thus, the confiscation and banning of picketing materials and gatherings of inmates are not a per

25   se violation of plaintiff's constitutional rights.

26   **II.**    **CONCLUSION**

27         The court finds that Plaintiff has failed, and in fact will not be able, to state a cognizable

28   claim against any of the named defendants.  Accordingly, it is HEREBY RECOMMENDED that

this entire action be dismissed with prejudice.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).

Within **thirty (30) days** after being served with these Findings and Recommendations, plaintiff may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    April 16, 2008**                         _____/s/ **Sandra M. Snyder**_____
                                                     UNITED STATES MAGISTRATE JUDGE