1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD WARD, | CASE NO. 1:06-cv-00311-AWI-SMS PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS BE GRANTED |
| v. | |
| TOM VOSS, et al., | (Doc. 27) |
| Defendants. | OBJECTIONS DUE WITHIN THIRTY DAYS |
| _____/ | |

## **FINDINGS and RECOMMENDATIONS**

**I.     Procedural History**

Plaintiff Ronald Ward ("Plaintiff") is a civil detainee proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed this action on March 21, 2006. (Doc. 1.) Plaintiff was allowed to proceed on his claims in the complaint against Defendants Tom Voss, Barbara Devine, Brian Bowley, Kim Wyatt, September Winchell, Ryan Arguello, Rocky Spurgeon, Jim Robinson, Patrick Daley, James Walter, and Gary Renzaglia (hereinafter "Defendants") for violation of his rights under the First Amendment. (Doc. 13.) On April 9, 2010, Defendants filed a motion for summary judgment. (Doc. 27.) On May 10, 2010, Plaintiff filed an opposition. (Doc. 32.) Defendants filed a reply on May 19, 2010. (Doc. 34.) The motion is deemed submitted.

For the reasons discussed herein below, Defendants are entitled to summary judgment on

1 Plaintiff's claim(s) such that their motion should be granted.

2 **II.      Summary Judgment Standard**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  *Id*.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Id*. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing

law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record they wish the Court to consider. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to mine the record for triable issues of fact. *Id.*

### III.  Facts

Plaintiff was provided with the requirements to oppose a motion for summary judgment on March 17, 2009. (Doc. 18-1.) Despite this, Plaintiff neither filed his own separate statement of disputed facts, nor admitted or denied the facts set forth by Defendant as undisputed. Local Rule 56-260(b). Further, neither Plaintiff's operative pleading, nor his brief in opposition were signed under penalty of perjury such that they do not constitute an opposing affidavit for purposes of the summary judgment rule. *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e). Rather, Plaintiff submitted two declarations -- his own and that of a fellow detainee, Eric K. Dannenberg. Therefore, Defendants' statement of undisputed facts is accepted except where brought into dispute by the declarations Plaintiff submitted in support of his opposition.

Plaintiff Ronald Ward is detained at Coalinga State Hospital ("CSH") pursuant to Welfare and Institutions Code section 6600, et seq. (Doc. 27-2, UMF No. 1.) CSH is a high-security psychiatric hospital that houses individuals committed, pursuant to Welfare and Institutions Code section 6600, et seq., as sexually violent predators. (*Id.,* UMF No. 2.) A Sexually Violent Predator ("SVP") is a person who (1) has been convicted of sexually violent offenses against more than one victim and (2) has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely the person will engage in future sexually violent criminal behavior. (*Id.,* UMF No. 3)

3

1    CSH's population of detained sexually violent predators (SVPs) poses a danger to the
2    health and safety of others. (*Id.*, UMF No. 3 [defining SVPs as persons likely to engage in future
3    sexually violent criminal behavior].)  It has also been staff's experience that when CSH detainees
4    are in close proximity to each other, confrontations occur. (*Id.*, UMF No. 15.)  For example, in
5    2005-2006, CSH had multiple incidents requiring staff intervention, six of which
6    resulted in injury. (*Id.*, UMF No. 6.)  During this time, CSH housed approximately 275 civil
7    detainees committed as SVPs. (*Id.*, UMF No. 4.)  As a result of CSH's detainee population, CSH
8    must maintain security in the facility and minimize the risk of harm to both staff and residents.
9    (*Id.*, UMF No. 5.)  In 2005, CSH staff discovered that the hospital's phone system was being
10   manipulated by the detainees. (*Id.*, UMF No. 7.)  To ensure that the phones could no longer be
11   manipulated, CSH installed a new phone system on February 21, 2006. (*Id.*, UMF No. 7.)  Both
12   the new and old phone systems provided the detainees with four phones per unit. (*Id.*, UMF No.
13   8.)  However, the new phone system designated two of the four phones for incoming calls only,
14   while the other two were for outgoing calls only. (*Id.*, UMF No. 8.)  A group of CSH detainees
15   did not like the new phone system and, as a result, on February 24, 2006 and March 3, 2006
16   Plaintiff and a number of detainees (160 and 140 respectively) assembled in the Main Courtyard.
17   (*Id.*, UMF No. 9; Doc. 31, Ward Dec., ¶¶ 3 & 5.)

18    Plaintiff was aware that negotiations had taken place between the Patient Advisory
19   Committee (PAC) and CSH's administration which had improved some, but not all of their
20   conditions of confinement. (Doc. 31, Ward Dec., ¶ 4.)  On March 6, 2006, March 7, 2006, and
21   March 9, 2006 Plaintiff and a lesser number of detainees held signs and stood in a picket line in
22   "The Mall" area of CSH (Doc. 31, Ward, Dec., ¶¶ 8 - 17; Doc. 30, Dannenberg Dec., ¶¶ 2 - 10)
23   protesting the modified phone system (Doc. 27-2, UMF No. 10) and engaged in the following
24   methods of protest: "(1) refusal to attend therapy groups, (2) refusal to attend school, [and] (3)
25   refusal to attend jobs. . ." (*id.,* UMF No. 22).

26    On March 7th, a group of four Unit Supervisors approached the picketers and told them
27   to leave because they were impeding traffic. (Dec. 31, Ward Dec., ¶ 13.)  Another detainee
28   responded that such an assertion was ridiculous as The Mall was extremely wide at that point and

4

the picket line was maintained parallel to the length of the wall such that no one could complain that the picket line was blocking entrance to the Canteen or Grill and that no one had requested anyone on the line to move. (*Id.*) Defendant Bowley insisted that the picket line at least move across The Mall against the Main Court Yard windows, with which the detainees complied. (*Id.*)

On March 9th, at approximately 2:00 p.m., Defendant Winchell approached Plaintiff and the other detainees, told them that the policy had been changed such that The Mall was no longer a valid destination to sign out to, ordered them to leave, and then yelled at nearby officers to disperse the group. (Doc. 31, Ward, Dec., ¶¶ 8 - 17; Doc. 30, Dannenberg Dec., ¶¶ 2 - 10.) The group ultimately left the area when Officer Gonzales politely and respectfully requested that they do so to provide him a chance to sort things out. (*Id.*)

On March 10, 2006, detainee inmates were no longer allowed to "sign out to" and gather on The Mall or in the Main Court Yard, so a number of detainees signed out to the Canteen and held picket signs while in line waiting to enter the canteen. (*Id.*, ¶ 18 and ¶¶ 13, 14 respectively.) During the protests, CSH detainees were asked to leave the mall area if they did not have a destination or were impeding traffic. (Doc. 27-2, UMF, Nos. 16-18.) For example, during the March 10th protest, Defendant Bowley asked detainees to leave for that reason and because the number of people in the facility was becoming a safety issue. (*Id.*, UMF, Nos. 12, 13, 14, 18.) Further, on March 10th, the detainees were planning to hold a meeting at 1:00 p.m. in the Main Court Yard, but at noon an announcement was made that the Main Court Yard would be closed from noon to 2:00 p.m. and then at 2:00 p.m. another announcement was made that the Main Court Yard would be closed until further notice. (Doc. 31, Ward, Dec. ¶ 19.) Thereafter, CSH detainees were required to be signed out to specific destinations and the number of individuals permitted in The Mall area was limited to an amount proportionate to the number of Police Services and other staff available to monitor the area in a manner that ensured staff and detainee safety. (Doc. 27-2, UMF Nos. 11, 15.) Subsequently, pieces of paper larger than legal size, and all protest signs (regardless of size) were confiscated and/or deemed to be contraband and no more than 30 detainees were allowed on the Main Court Yard at a time. (Doc. 31, Ward, Dec. ¶ 19, 20; Doc. 30, Dannenberg Dec, ¶¶ 15, 16, 18.)

5

1  During this time, CSH detainees had a number of means by which to express their
2  dissatisfaction with either CSH policy or hospital management. (Doc. 27-2, UMF Nos. 19-22.)
3  For example, there was a complaint review process in place that provided for review of detainee
4  complaints first by the Patients' Right Advocate in the Patients Rights Office at CSH and then, in
5  succession, CSH's Executive Director, Central Office of Patients Rights, and Department of
6  Mental Health's Office of Human Rights. (*Id.,* UMF Nos. 19-20.) In addition, in 2006, the CSH
7  detainees had a patient advisory committee that regularly met with management to discuss
8  concerns and complaints. (*Id.,* UMF No. 21.) Detainees could also refuse to attend therapy
9  groups, school, and their jobs. (*Id.*, UMF No. 22.)

10  In the years since this incident, all of the changes that led Plaintiff to file this action have
11  been relaxed; detainees are now allowed to congregate on The Mall; the Grand Meeting Room
12  has been opened to detainees; detainees are allowed to use pens and highlighters (which are now
13  available for purchase in the canteen); they are no longer limited to legal size paper; and
14  detainees have been allowed to peacefully assemble for the purposes of protesting various CSH
15  policies, practices, and procedures. (Doc. 31, Ward, Dec., ¶ 22.)

16  Plaintiff sued all Defendants in their official and personal capacities seeking monetary
17  damages and injunctive relief (Doc. 1, Compl., p. 3) and seeks redress for an alleged violation of
18  his First Amendment constitutional rights to free speech and peaceful assembly (Doc. 1, Compl.).

19  **IV.    The Challenged Regulation and Plaintiff's First Amendment Rights**

20  Defendants seek summary judgment arguing that none of their actions unconstitutionally
21  impinged on Plaintiff's First Amendment rights. (Doc. 27-1, MSJ P&A, 2:4-7.)

22  Plaintiff has a recognized right to associate and to engage in protected First Amendment
23  activities such as speech and assembly. *Roberts v. United States Jaycees*, 468 U.S. 609, 618
24  (1984). Plaintiff is civilly detained in a state hospital, and as a result, some curtailment of his
25  rights is expected. *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). "A detainee simply does not
26  possess the full range of freedoms of an unincarcerated individual." *Bell v. Wolfish*, 441 U.S.
27  520, 546 (1979). Plaintiff's allegations challenge the restriction of his rights to freedom of
28  speech and assembly.

The law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of those housed at the facility. *See, e.g. Youngberg v. Romeo*, 457 U.S. 307, 319-22 (1982). A challenged regulation is valid if it bears a rational relation to legitimate penological interests. *Overton*, 539 U.S. at 131-132 *ref Turner v. Safley*, 482 U.S. 78, 89 (1987); *ref Pell v. Procunier*, 417 U.S. 817, 822 (1974).

Four factors are relevant in deciding whether a regulation affecting a constitutional right that survives detainment withstands constitutional challenge: (1) whether the regulation has a "'valid, rational connection'" to a legitimate governmental interest; (2) whether alternative means are open to inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and detainees and facility resources; and (4) whether there are "ready alternatives" to the regulation. *Overton*, 539 U.S. at 131-132 *ref Turner*, 482 U.S. at 89-91.

When addressing these factors, "substantial deference" must be accorded to the professional judgment of administrators, "who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 131-132 *ref Pell*, 417 U.S. at 826-827; *Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 128 (1977); *Turner*, 482 U.S. at 85, 89; *Block v. Rutherford*, 468 U.S. 576, 588 (1984); *Bell*, 441 U.S. at 562. While most of the cases addressing the deference to be accorded to prison authorities have involved convicted inmates, the Supreme Court has held that same deference is to be accorded to prison authorities when challenges to regulations are raised by detainees. *Bell*, 441 U.S. at 548. "The burden, moreover, is not on the State to prove the validity of prison regulations but on the [detainee] to disprove it." *Overton*, 539 U.S. at 132; *ref Jones*, 433 U.S. at 128; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987); *Shaw v. Murphy*, 532 U.S. 223, 232 (2001).

**A.     Valid, Rational Connection to a Legitimate Governmental Interest**

"[P]romot[ing] internal security, is perhaps the most legitimate of penological goals,"

*Overton*, 539 U.S. at 133; *ref e.g., Pell*, 417 U.S. at 823.  Rehabilitation of their charges and potential compromises of institutional security "are peculiarly within the province and professional expertise of corrections officials and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.  Courts cannot, of course, abdicate their constitutional responsibility to delineate and protect fundamental liberties.  But when the issue involves a regulation limiting one of several means of communication by an inmate, the institutional objectives furthered by that regulation and the measure of judicial deference owed to corrections officials in their attempt to serve those interests are relevant in gauging the validity of the regulation."  *Pell*, 417 U.S. at 827 (1974).

Defendants' evidence shows:  CSH's population of detained sexually violent predators (SVPs) poses a danger to the health and safety of others (Doc. 27-2, UMF No. 3 [defining SVPs as persons likely to engage in future sexually violent criminal behavior]); it has been CSH staff's experience that when CSH detainees are in close proximity to each other, confrontations occur (*id.* at UMF No. 15); for example, in 2005-2006, CSH had multiple incidents requiring staff intervention, six of which resulted in injury (*id.* at UMF No. 6); during this time, CSH housed approximately 275 detainees committed as SVPs; (*id.* at UMF No. 4); as a result of CSH's detainee population, CSH must maintain security in the facility and minimize the risk of harm to both staff and other detainees (*id.* at UMF No. 5); during March 2006, Plaintiff, along with other detainees at CSH, staged various protests in The Mall area of the facility regarding the phone system (*id.* at UMF No. 10); during the protests on The Mall, CSH detainees were asked to leave The Mall area if they did not have a destination or were impeding traffic (*id.* at UMF, Nos. 16-18); in order to ensure the safety and supervision of CSH detainees and staff, CSH required detainees to be signed out to specific destinations (*id.* at UMF No. 15); and CSH staff also limited the number of individuals permitted in the mall area in an amount proportionate to the number of Police Services and other staff available to monitor the area in a manner that ensured staff and detainee safety (*id.* at UMF No. 11).

This evidence shows that Defendants acted based on the legitimate concern of ensuring

security and the safety of both CSH detainees and staff – which "is perhaps the most legitimate of penological goals," *Overton*, 539 U.S. at 133; *ref e.g., Pell*, 417 U.S. at 823, so as to deserve deference to Defendants' judgment. *Pell*, 417 U.S. at 827.

Plaintiff's evidence shows that: the assemblies and picketing were peaceful (*Id.*, UMF No. 9; Doc. 31, Ward Dec., ¶¶ 3, 5, 14); that they were not impeding traffic (Dec. 31, Ward Dec., ¶ 13); that the group moved when Defendant Bowley insisted they relocate to against the Main Court Yard windows (*Id*); that Defendant Winchell told the group of detainees that the policy had been changed such that The Mall was no longer a valid destination to sign out to, ordered them to leave, and then yelled at nearby officers to disperse the group (Doc. 31, Ward, Dec., ¶¶ 8 - 17; Doc. 30, Dannenberg Dec., ¶¶ 2 - 10); that the group ultimately left the area when Officer Gonzales politely and respectfully requested that they do so to allow him opportunity to sort things out (*Id*); that detainees were no longer allowed to "sign out to" and gather on "The Mall" or in the Main Court Yard, so a number of detainees signed out to the Canteen and held picket signs while in line waiting to enter the canteen (*Id.*, ¶ 18 and ¶¶ 13, 14 respectively); that the Main Court Yard was closed (Doc. 31, Ward, Dec. ¶ 19); that subsequently, pieces of paper larger than legal size, and all protest signs (regardless of size) were confiscated and/or deemed to be contraband and no more than 30 detainees were allowed on the Main Court Yard at any one time (Doc. 31, Ward, Dec. ¶ 19, 20; Doc. 30, Dannenberg Dec, ¶¶ 15, 16, 18); that in the years since this incident, all of the changes that led Plaintiff to file this action have been relaxed; detainees are now allowed to congregate on The Mall, the Grand Meeting Room has been opened to detainees, detainees are allowed to use pens and highlighters (which are now available for purchase in the canteen), and they are no longer limited to legal size paper and detainees have subsequently been allowed to peacefully assemble for the purposes of protesting various CSH policies, practices, and procedures (Doc. 31, Ward, Dec., ¶ 22). However, while this shows that the assemblies and picketing activities were not injurious and/or riotous events, it does not amount to substantial evidence to indicate that Defendants exaggerated their response to what were apparently the first detainee assemblies and picketing events that are the subject of this action, so as to vitiate the deference which is to be extended to Defendants in these

circumstances. *Pell*, 417 U.S. at 827 (1974).

Accordingly, Defendants have shown that their actions implementing the challenged regulation which curtailed the assembly and picketing activities of Plaintiff and the other detainees in February and March of 2006 had a valid, rational connection to a legitimate governmental interest.

**B.  Alternative Means**

Defendants' present evidence which shows that during the time at issue in the Complaint, CSH detainees could express their dissatisfaction with CSH policy and/or hospital management via a complaint review process that provided for review of detainee complaints first by the Patients' Right Advocate in the Patients Rights Office at CSH and then, in succession, CSH's Executive Director, Central Office of Patients Rights, and Department of Mental Health's Office of Human Rights (*Id.,* UMF Nos. 19-20); CSH detainees had a patient advisory committee that regularly met with management to discuss concerns and complaints (*Id.,* UMF No. 21); and detainees could protest by refusing to attend group therapy, school, and their jobs (*Id.,* UMF No. 19).

Plaintiff submitted evidence which shows he was aware that negotiations had taken place between the Patient Advisory Committee (PAC) and CSH's administration which had improved some, but not all of their conditions of confinement. (Doc. 31, Ward Dec., ¶ 4.) Plaintiff's evidence also confirmed that there was a detainee complaint process, though in his declaration, Plaintiff states that it is "fundamentally flawed" because the response time by CSH Administration is frequently protracted such that detainees' writs of habeas corpus filed in the local Superior Court have been dismissed on grounds of failure to exhaust administrative remedies so as to deny detainees access to the courts. (*Id*. ¶ 25.)

However, denial of access to the courts, and/or the inability to exhaust administrative remedies via the complaint process is not at issue in this motion. Rather, the only issue relevant to the present motion is whether CSH has a grievance process through which Plaintiff may express his displeasure with policies and procedures at CSH. The evidence presented in this motion shows that CSH has a detainee grievance process which is available for Plaintiff to use to

express his displeasure with various aspects of the conditions of confinement at CSH. It need not be highly efficient as alternatives to the challenged regulation "need not be ideal, . . . ; they need only be available." *Overton*, 539 U.S. at 135.

Accordingly, Defendants have shown that alternative means were available (via the detainee complaint process, the PAC, and refusing to attend group therapy, school, and their jobs) through which Plaintiff may express his concerns and/or displeasure with CSH policies and regulations.

### C. Accommodation Impact

When accommodating a demand would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls, a court is to be "particularly deferential" to prison administrators' regulatory judgments. " *Overton*, 539 U.S. at 135; quoting *Turner*, 482 U.S. at 90.

Defendants have shown that, at the time in question, allowing large groups of detainees to congregate caused a condition that sometimes led to confrontation such that CSH staff would not be able to assist detainees if need be which, in their judgment required them to prohibit the assembly and picketing activities at issue in this action. (Doc. 27-2, UMF No. 15.) Plaintiff does not address this factor other than by submitting evidence to show that the assemblies and picket lines were peaceful, and that such activities have subsequently been allowed at CSH. (Doc. 31, Ward Dec. ¶¶ 3, 5, 8-11, 13, 14, 16, 22; Doc. 30, Dannenberg Dec. ¶¶ 3-9, 11, 21.) However, such evidence does not suffice to prove that, at the time in question, Defendants' should have believed that the assemblies and picket lines would not lead to an altercation of such scale so as to impair CSH staff's ability to protect all CSH residents.

This Court is required to be "particularly deferential" to Defendants' regulatory judgments in situations such as this where they are acting in order to protect all who are inside a prison's walls. *Overton*, 539 U.S. at 135; quoting *Turner*, 482 U.S. at 90.

### D. Ready Alternatives

*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the

11

prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal. *Overton*, 539 U.S. at 136; *ref Turner*, 482 U.S. at 90-91. Plaintiff does not discuss, or present any evidence to show an obvious regulatory alternative, nor does he discuss any impact allowing the prohibited assembly and picketing activities would have on the valid penological goal. While Plaintiff declares that the assemblies and picket lines were peaceful, and that subsequent similar assembly and/or picketing activities have been allowed at CSH, (Doc. 31, Ward Dec. ¶¶ 3, 5, 8-11, 13, 14, 16, 22; Doc. 30, Dannenberg Dec. ¶¶ 3-9, 11, 21) he provides no legal basis, and the Court finds none, to establish that such circumstances and subsequent leniencies by CSH vitiate the valid penological goals that Defendants were operating under at the time in question in this action.

Thus, when according Defendants the deference they are due, all four factors relevant in deciding whether a regulation affecting a constitutional right that survives detainment withstands constitutional challenge weigh in Defendants' favor such that Defendants' motion for summary judgment should be granted.

## V.      Eleventh Amendment Immunity

Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. (Doc. 27-1, MSJ P&A, 8:1-22.)

The Eleventh Amendment prohibits federal courts from hearing suits brought against an unconsenting state, *Brooks v. Sulphur Springs Valley Elec. Co.*, 951 F.2d 1050, 1053 (9th Cir. 1991) (citation omitted); *see also Seminole Tribe of Fla. v. Florida*, 116 S.Ct. 1114, 1122 (1996); *Puerto Rico Aqueduct Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *Austin v. State Indus. Ins. Sys.*, 939 F.2d 676, 677 (9th Cir. 1991), and "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Accordingly, "[t]he Eleventh Amendment bars actions for damages against state officials who are sued in their official capacities in federal court." *Dittman v. California*, 191 F.3d 1020, 1026; *ref Kentucky v. Graham*, 473 U.S. 159, 169 (1985). "That is so because . . . a judgment against a public servant 'in his official capacity'

imposes liability on the entity that he represents." *Id.* (citation and internal quotation marks omitted in original).

Plaintiff's claims against Defendants, who are state officials, in their official capacities are barred by the Eleventh Amendment and are properly dismissed.

## VI.     Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v.Katz*, 533 U.S. 194, 200 (2001) (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), overruled on other grounds by *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 818 (2009)). In applying the two-part qualified immunity analysis, it must be determined whether, "taken in the light most favorable to [Plaintiff], Defendants' conduct amounted to a constitutional violation, and . . . whether or not the right was clearly established at the time of the violation." *McSherry v.City of Long Beach*, 560 F.3d 1125, 1129-30 (9th Cir. 2009). The second prong asks whether the right was clearly established such that a reasonable officer in those circumstances would have thought her or his conduct violated the alleged right. *Saucier*, 533 U.S. at 201; *Inouye v. Kemna* 504 F.3d 705, 712 n.6 (9th Cir. 2007). These prongs need not be addressed by the Court in any particular order. *Pearson*, 129 S.Ct. at 818. "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) *ref. Saucier*, 533 U.S. at 201-02.

"In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose [] liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009).

Defendants are entitled to qualified immunity so long as a right to unfettered freedom of speech and assembly by civil detainees was not clearly established at the time defendants acted.

13

*Norwood*, 591 F.3d at 1068 *ref. Saucier*, 533 U.S. at 201-02. "The relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Id. ref. Saucier*, 533 U.S. at 202 (emphasis added in *Norwood*).

As discussed in detail herein above, Plaintiff does not have a right to unfettered freedom of speech and assembly, particularly given the motivating legitimate penological concerns of facility safety and security as raised by Defendants.

Accordingly, Defendants are entitled to qualified immunity on Plaintiff's claim(s) that the regulations restricting his ability to assemble and/or picket regarding unpalatable issues at CSH violated his rights under the First Amendment.

## VII. Conclusion and Recommendation

Accordingly, this Court finds that Defendants Tom Voss, Barbara Devine, Brian Bowley, Kim Wyatt, September Winchell, Ryan Arguello, Rocky Spurgeon, Jim Robinson, Patrick Daley, James Walter, and Gary Renzaglia are entitled to summary judgment on Plaintiff's claims on the basis that their actions were justified to achieve a legitimate penological goal, that they are entitled to qualified immunity such that their motion for summary judgment should be granted, and that Plaintiff is not entitled to monetary damages against Defendants in their official capacities.

As set forth herein, the Court HEREBY RECOMMENDS:

(1) that Defendants Tom Voss, Barbara Devine, Brian Bowley, Kim Wyatt, September Winchell, Ryan Arguello, Rocky Spurgeon, Jim Robinson, Patrick Daley, James Walter, and Gary Renzaglia were justified by legitimate penological goals such that their motion for summary judgment, filed April 9, 2010 (Doc. 27), should be GRANTED;

(2) Plaintiff is not entitled to monetary damages against Defendants Tom Voss, Barbara Devine, Brian Bowley, Kim Wyatt, September Winchell, Ryan Arguello, Rocky Spurgeon, Jim Robinson, Patrick Daley, James Walter, and Gary Renzaglia in their official capacities and all such damage claims should be DISMISSED;

(3) Defendants Tom Voss, Barbara Devine, Brian Bowley, Kim Wyatt, September

        Winchell, Ryan Arguello, Rocky Spurgeon, Jim Robinson, Patrick Daley, James Walter, and Gary Renzaglia are entitled to qualified immunity such that their motion for summary judgment, filed February 5, 2010, thereon should be GRANTED;

(4)    that the Clerk of the Court be directed to enter judgment for the Defendants Tom Voss, Barbara Devine, Brian Bowley, Kim Wyatt, September Winchell, Ryan Arguello, Rocky Spurgeon, Jim Robinson, Patrick Daley, James Walter, and Gary Renzaglia and against Plaintiff; and

(5)    that the Clerk of the Court be directed to close the case.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   September 16, 2010**           /s/ Sandra M. Snyder
                                                    UNITED STATES MAGISTRATE JUDGE